UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Kevin O'Gorman | ) | |
| | ) | |
| Plaintiff, | ) | No. 11 CV 02439 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| City of Chicago, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Kevin O'Gorman filed this suit under 42 U.S.C. § 1983 against the City of Chicago, seeking compensatory and punitive damages for alleged violations of his right to due process under the Fourteenth Amendment.[1] The City has moved to dismiss the complaint. R. 13. For the reasons stated below, the motion is granted, but O'Gorman has 21 days in which to file an amended complaint if he can, in good faith, make sufficient allegations consistent with this opinion.

I.

At this stage of the litigation, we accept Plaintiff's allegations as true and draw reasonable inferences in Plaintiff's favor. *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2079 (2011). O'Gorman worked for the City as the General Foreman of Trades. R. 1 ¶ 4. As part of his job, O'Gorman ordered building supplies from Arrow Lumber under multiple contracts between the City and Arrow from 2003 to 2005. *Id.* ¶¶ 14–16. In November 2004, the Inspector General's Office of the City began to investigate these orders after

---

[1]This Court has subject matter jurisdiction under 28 U.S.C. § 1331.

an Arrow employee reported that Arrow treated orders placed by O'Gorman differently from other orders. *Id.* ¶¶ 17–18. At the time, Alexander Vroustouris was the Inspector General and William Marback worked as a Deputy Inspector General. *Id.* ¶¶ 9–12.

On May 7, 2007, O'Gorman was arrested and charged with theft of City property. *Id.* ¶ 19. Two days later, he was placed on paid administrative leave. *Id.* On May 10, the City issued a press release announcing that O'Gorman had been charged with diverting "more than $50,000 in goods from a city lumber contractor for his own use from early 2003 to 2005, and then filed false paperwork in an attempt to cover up the theft." *Id.* ¶ 21. This information was published shortly thereafter in the Chicago Tribune and on the Inspector General's website. *Id.* ¶¶ 23–24.

A hearing on the charges was scheduled. *Id.* ¶ 24. But before the hearing was held, O'Gorman was allegedly told (by his union representative, Thomas Ryan) that Fran Bailey, the City's Human Resources Director, recommended that O'Gorman resign in order to protect various benefits that he could not receive if he were outright fired. *Id.* Ryan also stated that O'Gorman would be found guilty and fired even "if Jesus Christ himself showed up to testify" in his favor. *Id.* Around this time, Frank Scalise, Deputy Commissioner and O'Gorman's immediate supervisor, and Ron Huberman, President of the Chicago Transit Authority, both told O'Gorman that if he resigned, he would be reinstated as soon as he was acquitted of the criminal charges. *Id.* ¶¶ 25–26. O'Gorman resigned on August 24, 2007. *Id.* ¶ 27.

On January 19, 2010, the Cook County Criminal Court acquitted O'Gorman of all criminal charges. *Id.* ¶ 28. O'Gorman immediately requested reinstatement, which

the City promptly denied. *Id.* ¶¶ 29–30. On April 10, 2010, the City reopened a civil case – which had been stayed, pending the outcome of the criminal case – against O'Gorman, under the Illinois Whistleblower Act and the Chicago False Claims Act. *Id.* ¶¶ 32–33. In February 2011, Anthony Pilas, O'Gorman's assistant, was fired following an employment hearing, during which the hearing officer made findings of fact that implied criminal activity by O'Gorman based on testimony from the Inspector General's Office. *Id.* ¶¶ 40–45.

O'Gorman alleges that, based partly on these findings of fact, the Inspector General published O'Gorman's name on a "do not hire" list of former City employees who were permanently ineligible for rehire. *Id.* ¶ 34. Those listed were chosen because they had engaged either in criminal acts or in acts of "moral turpitude." *Id.* ¶¶ 34, 36. The list was also publicized in a City press release, and the Chicago Tribune published an article about the list. *Id.* ¶¶ 34-35. The Better Government Association published the list of names on its website. *Id.* ¶ 38.

O'Gorman filed this lawsuit in April 2011. *Id.* He alleges that the City deprived him of his property and liberty interests in employment without due process, which violated his rights under the Fourteenth Amendment.[2] He alleges that City officials with final policymaking authority caused the deprivation and seeks redress under 42

---

[2] O'Gorman contends that he had been temporarily suspended between the time of his resignation on August 24, 2007, and the list's publication in February 2011, or alternatively, that he reasonably believed he had been temporarily suspended and only discovered that he had been permanently terminated upon the list's publication in February 2011. *Id.* ¶¶ 39.

U.S.C. § 1983. *Id.* at 10. The City filed a motion to dismiss, [R.13], which is now before this Court.

## II.

Under Federal Rule of Civil Procedure 12(b)(6)**,** a complaint need only include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). This short and plain statement must "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atlantic v. Twombly*, 550 U.S. 544, 555 (2007). The Seventh Circuit has explained that this rule "reflects a liberal notice pleading regime, which is intended to 'focus litigation on the merits of a claim' rather than on the technicalities that might keep plaintiffs out of court." *Brooks v. Ross*, 578 F.3d 574, 580 (7th Cir. 2009) (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514 (2002)).

"A motion under Rule 12(b)(6) challenges the sufficiency of the complaint to state a claim upon which relief may be granted." *Hallinan v. Fraternal Order of Police Chicago Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). "[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *McGowan v. Hulick*, 612 F.3d 636, 637 (7th Cir. 2010) (courts accept factual allegations as true and draw all reasonable inferences in plaintiff's favor). A "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. –, 129 S. Ct. 1937, 1949 (2009) (quoting *Twombly*, 550 U.S. at 570). These allegations "must be enough to raise a right to relief above the

4

speculative level." *Twombly*, 550 U.S. at 555. And the allegations that are entitled to the assumption of truth are those that are *factual*, rather than mere *legal* conclusions. *Iqbal*, 129 S. Ct. at 1950.

### III.

Section 1983 provides a cause of action against a person, who, acting under color of state law, deprives an individual of any "rights, privileges, or immunities secured by the Constitution and laws" of the United States. *Livadas v. Bradshaw*, 512 U.S. 107, 132 (1994). It provides the procedural vehicle for bringing suit as a "method for vindicating federal rights elsewhere conferred." *Graham v. Connor*, 490 U.S. 386, 393-94 (1989). The plaintiff must identify the specific constitutional right that was infringed. *Id.* at 394. O'Gorman alleges that the City deprived him of his property and liberty interests without due process, in violation of the Fourteenth Amendment. R. 1 at 9-10. In moving to dismiss, the City advances several arguments, which the Court now addresses.

**A. Statute of Limitations**

**1. Claims accruing in 2007**

First, the City argues that O'Gorman's claims are barred by the statute of limitations. R.13 at 2-4.[3] Borrowing from Illinois state law, the statute of limitations

---

[3] As the City points out, a motion to dismiss based on statute of limitations grounds is not actually a motion pursuant to Rule 12(b)(6) (failure to state a claim) because the statue of limitations period is an affirmative defense and a complaint need not plead around an affirmative defense. R. 13 at 2-3. Instead, so long as the complaint itself reveals the limitations defense (and so long as the motion is amenable to decision before discovery without a summary judgment motion), the motion is properly brought under Rule 12(c), a motion for judgment on the pleadings. *Leavell v. Kieffer*, 189 F.3d 492, 495 (7th Cir. 1999).

5

for § 1983 claims (of the type O'Gorman alleges) is two years. *Washington v. Summerville*, 127 F.3d 552, 555 (7th Cir. 1997). Although state law determines the length of the limitations period, federal law determines when a constitutional claim accrues (and thus when the limitations period starts). *Wilson v. Giesen*, 956 F.2d 738, 740 (7th Cir. 1991). Accrual generally occurs when a "plaintiff knows or should know that his or her constitutional rights have been violated." *Id.* Here, the statute of limitations began to run when O'Gorman knew or should have known that the City violated his Fourteenth Amendment rights by depriving him of due process. O'Gorman's complaint includes two discrete events when he knew or should have known that his rights had been violated.

The first discrete event was in 2007, when the City was supposed to hold an employment hearing on the charges against O'Gorman. R. 1 ¶ 24. O'Gorman became convinced that the hearing was a sham because he was told he would be fired even "if Jesus Christ himself showed up to testify." *Id.* When O'Gorman's hearing was (allegedly) rigged, O'Gorman should have known that his constitutional rights were violated because the due process he was to be afforded – the employment hearing – was illusory. As a result, the statute of limitations began to run in 2007 and expired in 2009, well before O'Gorman filed his complaint in 2011. *Id.* Therefore, O'Gorman's claims arising out of his change in employment status in 2007 are untimely, regardless of whether he resigned, was constructively discharged, or was fired.[4]

---

[4]This due process claim would fail even if it were not barred by the statute of limitations because O'Gorman was not legally deprived of his property interest in employment. O'Gorman

6

O'Gorman urges the application of "equitable estoppel" to extend the statute of limitations on claims arising out of the alleged due process violation in 2007. R.16 at 13. Equitable estoppel requires misconduct by a defendant and plaintiff's actual and reasonable reliance on that misconduct. *Lewis v. Washington*, 300 F.3d 829, 834 (7th Cir. 2002); *Ashafa v. City of Chicago*, 146 F.3d 459, 463 (7th Cir. 1998). Specifically, to apply equitable estoppel, the defendant must "take[] active steps to prevent the plaintiff from suing on time." *Brademas v. Indiana Housing Finance Authority*, 354 F.3d 681, 687 (7th Cir. 2004) (quoting *Sharp v. United Airlines*, 236 F.3d 368, 372 (7th Cir. 2001)); *Mull v. ARCO Durethane Plastics, Inc.*, 784 F.2d 284, 292 (7th Cir. 1986). Here, O'Gorman argues that he resigned in advance of the employment hearing because Human Resources Director Bailey said (according to Union Representative Ryan) that the hearing would be a sham, and that O'Gorman believed he would be reinstated if he was acquitted in the criminal case based on the representations of his supervisor, Scalise, and the then CTA-President, Huberman. R. 1 ¶¶ 24-27.

There are several reasons that equitable estoppel does not apply here. First, reliance on the alleged Bailey warning that the hearing was going to be a sham is not a basis for extending the limitations period on the claim; to the contrary, it is evidence

---

claims that since he resigned to avoid the risk of an unfavorable decision at the employment hearing and the loss of benefits, he was essentially coerced into resigning. R. 1 ¶¶ 24, 27. Coerced resignation involves situations in which "the employee must resign or suffer severe consequences, such as facing criminal charges." *Palka v. Shelton*, 623 F.3d 447, 453 (7th Cir. 2010). *Palka*, a Section 1983 case, held that an employee's resignation to avoid risking an unfavorable result by a disciplinary board and the loss of benefits, "is not the kind of choice that makes an otherwise voluntary resignation involuntary." *Id.* O'Gorman, too, had the opportunity to avail himself of a hearing, but chose not to do so in order to protect his benefits.

7

of the alleged due process violation itself, gave O'Gorman notice of the claim, and *started* the limitations period. Second, Scalise's and Huberman's alleged promises of reinstatement after an acquittal – which occurred over 2 years after the scheduled hearing – do not excuse a failure to sue for the rigged employment hearing or the loss of employment in 2007. The alleged procedural deficiency in the hearing itself and the loss of employment for two years would not be remedied by a reinstatement years later, so O'Gorman could not reasonably rely on the reinstatement promise to delay filing a lawsuit. Indeed, the reliance is all the more unreasonable because Scalise and Huberman were not in a position to guarantee an acquittal in the criminal case (and O'Gorman does not allege or argue that they guaranteed an acquittal).

What's more, O'Gorman neither alleges facts (just a bare conclusion) nor explains why it was reasonable for him to believe that his "immediate" supervisor, R. 1 ¶ 25, or the president of a City agency for which O'Gorman did not work, had the authority to reinstate O'Gorman. Instead, O'Gorman's sparse, one-paragraph argument for equitable estoppel, R. 16 at 13, merely cites one case for one general principle, *Smith v. City of Chicago Heights*, 951 F.2d 834 (7th Cir. 1992), which does

8

not support his argument.[5] Equitable estoppel, therefore, does not extend the statute of limitations on his 2007 claims.

Nor may O'Gorman rely on the doctrine of "continuing violation" to rescue the 2007 claims by piggy-backing them onto the 2010 refusal to reinstate. O'Gorman argues that it was unreasonable for him to sue in 2007 because he was assured that he would be reinstated anyway upon his acquittal. R. 16 at 14 (citing *Galloway v. General Motors Serv. Parts Operations*, 78 F.3d 1164 (7th Cir. 1996)). The Seventh Circuit has explained that under certain conditions, the statute of limitations may be extended for events occurring outside of the time period. *Id.* at 1166. In *Galloway*, the event was a derogatory remark that fell outside the limitations period. *Id.* at 1165. *Galloway* explained that the remark was not severe enough to be actionable at the time it was made. But later a pattern of conduct emerged such that the earlier event became part of a continuing violation, so the limitations period could reach back to include the earlier event. *Id.*

In contrast, here the 2007 conduct was a discrete and actionable event at the time it happened. As explained above, O'Gorman knew the basis for the 2007 claims at that time, when he was allegedly informed that the hearing would be a sham.

---

[5]O'Gorman cites *Smith* for the following: "it is not necessary that defendant intentionally mislead or deceive plaintiff or even intend its conduct to induce delay." R. 16 at 13. O'Gorman noticeably does not cite the specific page of the opinion on which that principle appears. R. 16 at 13. In fact, that statement was *not* adopted in *Smith*. The statement appears in a citation prefaced by "but cf.," to contrast the line of cases that *Smith* adopted, which do require, before applying equitable estoppel, some form of misconduct by a defendant. 951 F.2d at 841 (adopting formulation in *Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 450-51 (7th Cir. 1990)).

O'Gorman did not have to wait and see if the conduct would worsen into an actionable claim; at that moment in 2007, he was going to lose his job after a sham hearing, so filing a lawsuit would not have been premature. The 2010 denial of reinstatement cannot be used to resuscitate the 2007 claim.

### 2. Claims accruing in 2010

O'Gorman claims that, in 2010, he expected to be reinstated to his former position because he was acquitted of all criminal charges. R. 1 ¶ 39. After the January 19, 2010 acquittal, O' Gorman immediately requested reinstatement from the City. *Id.* ¶¶ 28-29. The City refused. *Id.* ¶ 30. If the refusal to reinstate actually did state a legal claim, that claim accrued in 2010 and this lawsuit would have been timely as to the 2010 claim. As explained below, however, the refusal to reinstate (separate and apart from the "do not hire" designation) fails to state a claim for municipal liability.

### B. Municipal Liability

A local government may be sued under § 1983 for an injury inflicted solely by its employees or agents only if it relates to the execution of the city's official policy or custom. *Monell v. Dept. of Soc. Servs. of New York*, 436 U.S. 658, 694 (1978). To successfully state a claim for municipal liability, a plaintiff must allege "(1) an express policy that would cause a constitutional deprivation if enforced; (2) a common practice that is so widespread and well settled as to constitute a custom or usage with the force of law even though it is not authorized by written law or express policy; or (3) an allegation that a person with final policy-making authority caused the constitutional injury." *Lawrence v. Kenosha County*, 391 F.3d 837, 844 (7th Cir. 2004). O'Gorman

10

relies on the third way of establishing municipal liability – that several individuals with final policy-making authority deprived him of due process. R. 16 at 11-12.

O'Gorman fails to adequately allege, however, that the named individuals had any influence over his employment status. In the complaint, O'Gorman appears to allege that Bailey, Scalise, and Huberman had policy-making authority. But his response to the motion to dismiss mentions only the Inspector General. R. 16 at 12. Even if O'Gorman had not waived pointing the finger at the three named in the complaint, they would not count as policy-makers. There is no allegation that Fran Bailey, who allegedly advised O'Gorman (through Thomas Ryan, his union representative) to resign, had control over the employment hearing or, more importantly, the hearing officer. There is even less reason to believe that either Scalise or Huberman had final policy-making authority. Huberman was President of the Chicago Transit Authority – not the Department of General Services – at the time he allegedly assured reinstatement upon acquittal. R. 1 ¶ 26. O'Gorman does not adequately allege, beyond a mere conclusion, that Huberman had authority over hiring and firing in the Department of General Services. Nor does O'Gorman allege that Huberman had any authority over the employment hearing. And Scalise was O'Gorman's immediate supervisor, and O'Gorman does not allege facts (as distinct from legal conclusions) regarding authority to reinstate, hire, or fire. *Id.* ¶ 25.

O'Gorman also alleges that then-Inspector General Vroustouris and Deputy Inspector General Marback each held final policymaking authority with regard to the City's actions. *Id.* ¶¶ 9-13, 18, 23, 34. O'Gorman argues that *Angara v. City of Chicago*,

11

947 F.Supp. 1252, 1256 (N.D. Ill. 1996), establishes that the Inspector General has policy-making authority over *investigations* of employees. R. 16 at 12. But with regard to the failure to reinstate claim, *Angara* does not apply because investigations are distinct from *employment* decisions, and especially distinct from the specific promises of reinstatement that O'Gorman alleges were made by Scalise and Huberman.

The "do not hire" list, published in February 2011, is potentially another matter. The complaint alleges that "the Inspector General" "published" the do not hire list. *Id.* ¶ 34. This is not a crystal clear allegation that the Inspector General had final policy-making authority over the list's creation, but O'Gorman's response argues that the complaint adequately alleges municipal liability because the Inspector General is a final policy-maker. R. 16 at 12. To repeat the earlier point, O'Gorman relies on a case that holds only that the Inspector General has final authority over investigations, not employment, so the case does not support O'Gorman's argument. But the complaint does allege that the Inspector General "published" the do not hire list. Perhaps that is a sufficient stand-in for an allegation of policy-making authority.

There are two problems with the sufficiency of that allegation, the first of which is internal inconsistency within the complaint itself. Although the complaint alleges that the Inspector General "published" the list, the complaint also refers to contemporaneous (February 2011) articles describing the list in the Chicago Tribune and on the website of the Better Government Association (BGA). Because the complaint refers to those articles, the Court may consider them in evaluation the motion to dismiss. *Hecker v. Deere & Co.*, 556 F.3d 575, 582 (7th Cir. 2009). Both

12

references are inconsistent with the allegation that the Inspector General "published" the do not hire list. The Tribune article quotes a City Law Department spokesperson as stating that the "Daley administration decides who ends up blacklisted." (The article is still available on the Internet at the link reproduced in the footnote.[6]) Indeed, the current Inspector General criticized the list in that other municipalities related to Chicago but technically separate, such as the Chicago Public School and the Park District, are not bound by the list. To be sure, the article also states that the Inspector General (as well as a hiring monitor) "pushed for the list's creation," but that is a far cry from O'Gorman's allegation that the Inspector General "published" the list. The BGA website is even more starkly inconsistent with O'Gorman's allegation.[7] The BGA links to a copy of the list itself, and the list states, "The list will be maintained by an assistant commissioner in the Department of Human Resources."[8]

Second, on top of the inconsistencies is the added problem that no state law, no ordinances, nor any other express policy grants the Inspector General final policy-making authority over employment decisions – at least no law, ordinances, or policies that O'Gorman has identified. Remember, O'Gorman's sparse argument on this specific issue was limited to citing a case concerning Inspector General authority over

---

[6]http://articles.chicagotribune.com/2011-02-08/news/ct-met-city-do-not-hire-20110208_1_list-inspector-general-joseph-ferguson-jenny-hoyle.

[7]The BGA website article describing the list may be found at the following link: http://notebook.bettergov.org/2011/02/09/bga-posts-city-of-chicagos-do-not-hire-list/

[8]https://s3.amazonaws.com/s3.documentcloud.org/documents/32226/city-of-chicago-do-not-hire-list-bga-feb-2011.pdf.

investigations, not employment. Thus, as currently drafted, the complaint does not adequately allege a decision by a final policy-maker for which the City may be held liable.

It is possible, however, that O'Gorman could amend the complaint to allege that the Commissioner of Human Resources is responsible for the list's establishment. The allegation would be based on the reference on the list itself to the maintenance of the list by the assistant commissioner of Human Resources. The City already has admitted that the Commissioner of Human Resources shares final policy-making authority with the City Council over employment policies, R. 13 at 6, and thus, O'Gorman can presumably overcome this particular hurdle in an amended complaint. If O'Gorman wishes to amend the complaint, he may do so within 21 days. In deciding whether and how to amend the complaint, however, O'Gorman should also consider whether he can overcome other potential hurdles, such as whether the injury from the do not hire list is traceable to the 2007 resignation in lieu of hearing, which is an untimely claim (as discussed earlier).

### C. Property Interest and Liberty Interest

Although the current complaint must be dismissed, the Court addresses two additional issues in order to provide further guidance on the (potential) amended complaint. First, the City argues that O'Gorman has not adequately alleged the deprivation of a property interest, a requirement for a successful procedural due process claim. The Court agrees. To establish a due process claim based on a property interest, O'Gorman must allege a constitutionally protected interest. *Moss v. Martin*,

14

473 F.3d 694, 700 (7th Cir. 2007). Property interests are not created by the Constitution but are instead derived from independent sources, such as state law. *Johnson v. City of Fort Wayne, Ind.*, 91 F.3d 922, 943 (7th Cir. 1996). To establish a property interest in his job under Illinois law, O'Gorman must allege that he legitimately expected that his employment would continue by showing a specific "ordinance, state law, contract, or understanding limiting the ability of the state or state entity to discharge him." *Moss*, 473 F.3d at 700 (quoting *Krecek v. Bd. of Police Com'rs of La Grange Park*, 646 N.E.2d 1314, 1318-19 (Ill. App. Ct. 1995)).

O'Gorman cites no ordinance, state law, or contract to support his property interest in reinstatement. Instead, he relies on representations by supervisor Scalise and then-CTA President Huberman assuring him that the City would rehire him upon his acquittal in the criminal case. R. 1 ¶¶ 25-27. As described above, however, neither Huberman nor Scalise had authority to bind the City on an employment matter. To be sure, there might be a difference between final policy-making authority for § 1983 municipal liability versus the authority to bind a government for purposes of creating a protectible property interest, but under Illinois law, "a contract cannot be implied if the statutory method of executing a municipal contract has not been followed." *McMahon v. City of Chicago*, 789 N.E.2d 347, 352 (Ill. App. Ct. 2003). O'Gorman does not allege that either Huberman or Scalise followed any statutory (or ordinance-based) method to grant him a property interest in reinstatement. Therefore, the procedural due process claim based on a property interest would have failed to state a claim in any event.

15

Second, the City argues that O'Gorman did not adequately allege a liberty interest protected by the due process clause. A public employee may sue his public employer for a procedural due process violation based on a protected liberty interest "[i]f the character and circumstances of a public employer's stigmatizing conduct or statements are such as to have destroyed an employee's freedom to take advantage of other employment opportunities." *Bordelon v. Chicago Sch. Reform Bd. of Trustees*, 233 F.3d 524, 531 (7th Cir. 2000). A mere adverse effect is insufficient; instead, "the employee must show that the stigmatizing actions 'make it virtually impossible for the employee to find new employment in his chosen field.'" *Id.* (quoting *Head v. Chicago Sch. Reform Bd. of Trustees*, 225 F.3d 794, 801 (7th Cir. 2000)). O'Gorman "must show that (1) he was stigmatized by the defendant's conduct, (2) the stigmatizing information was publicly disclosed and (3) he suffered a tangible loss of other employment opportunities as a result of public disclosure." *Townsend v. Vallas*, 256 F.3d 661, 669-70 (7th Cir. 2001).

O'Gorman's inclusion on the do not hire list might implicate a protected liberty interest, in light of the obvious ban on City employment effectuated by the list. And the list was (eventually) distributed outside the City's internal departments and publicized by the BGA posting to the general public. At least at the motion-to-dismiss stage, a protected liberty interest might be sufficiently alleged. But even if a protected liberty interest is alleged, O'Gorman must consider whether the injury from the do not hire list is actually a result of the 2007 resignation. If so, then the statute of limitations

16

problem that bars claims arising from the 2007 resignation might also bar the claim based on the do not hire list.

### D. Punitive Damages

Lastly, the City correctly argues that O'Gorman cannot seek punitive damages against a municipality. The Supreme Court has held that "a municipality is immune from punitive damages under 42 U.S.C. § 1983." *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981). The claim for punitive damages is dismissed.

### IV.

The City's motion to dismiss [R. 13] is granted. O'Gorman may file an amended complaint within 21 days, that is, on or before February 17, 2012. Status hearing set for February 21, 2012 at 8:30 a.m.

ENTERED:

*Edmond E. Chang*

Honorable Edmond E. Chang
United States District Judge

DATE: January 27, 2012