**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| KEVIN O'GORMAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 11-cv-2439 |
| | ) | |
| CITY OF CHICAGO, | ) | Judge Robert M. Dow, Jr. |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Kevin O'Gorman filed this suit under 42 U.S.C. § 1983 against the City of Chicago, seeking compensatory and punitive damages for alleged violations of his right to due process under the Fourteenth Amendment. After his first complaint was dismissed, O'Gorman filed an amended complaint, adding additional facts and an equal protection claim. The City has moved to dismiss the amended complaint. For the reasons stated below, the Court grants the City's motion to dismiss [35] in its entirety.

**I.     Background**

At this stage of the litigation, we accept Plaintiff's allegations as true and draw reasonable inferences in Plaintiff's favor. *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2079 (2011). O'Gorman worked for the City as the General Foreman of Trades. As part of his job, O'Gorman ordered building supplies from Arrow Lumber under multiple contracts between the City and Arrow from 2003 to 2005. Arrow is owned and operated by Donald Beal. In November 2004, the Inspector General's Office of the City began to investigate O'Gorman's orders from Arrow after an Arrow employee reported that the company treated orders placed by O'Gorman differently from other orders. At the time, Alexander Vroustouris was the Inspector General and

William Marback worked as a Deputy Inspector General. According to the amended complaint, Arrow and Beal impeded the Inspector General's investigation by destroying relevant documents and creating fake ones to replace them. O'Gorman further alleges that Vroustouris did not make efforts to retrieve the destroyed documents or investigate Arrow's or Beal's actions with respect to them. Despite Arrow's and Beal's misconduct, O'Gorman alleges that the City continued to award Arrow large contracts.

On May 7, 2007, in connection with the Inspector General's investigation, O'Gorman was arrested and charged with theft of City property. Two days later, he was placed on paid administrative leave. On May 10, the City issued a press release announcing that O'Gorman had been charged with diverting "more than $50,000 in goods from a city lumber contractor for his own use from early 2003 to 2005, and then filed false paperwork in an attempt to cover up the theft." This information was published shortly thereafter in the Chicago Tribune and the Inspector General provided a link to the Tribune article on its website about two weeks later. Around the time that O'Gorman was criminally charged and while he was still on paid administrative leave, Frank Scalise, Deputy Commissioner and O'Gorman's immediate supervisor, and Ron Huberman, then-Chief of Staff to the Mayor, told O'Gorman that if he resigned, he would be reinstated once he was acquitted of the criminal charges.[1]

In addition to the criminal charges, O'Gorman also was charged with violations of the City's Personnel Rules during the summer of 2007. At the time that O'Gorman was served with

---

[1] Huberman was appointed President of the Chicago Transit Authority (CTA) in the spring of 2007. The record is not clear on exactly when Huberman shifted position from Mayor Daley's Chief of Staff to President of the CTA. Huberman's position at the time that he allegedly promised O'Gorman reinstatement bears on Plaintiff's due process claim. In Plaintiff's original complaint, he claimed that Huberman was President of the CTA at the time that he made the promise. In his amended complaint, Plaintiff claims that Huberman was Mayor Daley's Chief of Staff at the time. At this stage, the Court draws all reasonable inferences in favor of Plaintiff and will assume that at the time Huberman allegedly promised O'Gorman that he could have his job back, he was the former Mayor's Chief of Staff.

the charges, Fran Bailey, the City's Human Resources Director, advised O'Gorman's union representative (Thomas Ryan) that if O'Gorman did not resign from his City employment, he would be fired. Bailey also told Ryan that a hearing on the charges would be a "sham." O'Gorman resigned on August 24, 2007.

During his criminal trial, O'Gorman alleges that the State's evidence against him included documents that Arrow allegedly fabricated during the Inspector General's investigation, some of which contained O'Gorman's forged initials and signature. On January 19, 2010, the Cook County Criminal Court acquitted O'Gorman of all criminal charges. In the course of the criminal proceedings, Beal, and Beal's assistant, Mark Piazza, allegedly entered a guilty plea in which they admitted to defrauding the City. After he was acquitted, O'Gorman immediately requested reinstatement. Judy Martinez, the City Commissioner, assured O'Gorman's attorney that his reinstatement would be reviewed in light of his acquittal and the statements made by Scalise and Huberman, but the City ultimately refused to reinstate O'Gorman.

O'Gorman alleges that the City refused to reinstate him because he was placed on a "Do-not-hire List." Am. Compl. ¶ 40.[2] O'Gorman alleges that he was placed on the list when he resigned, but was not told that would be a consequence of his resignation. The list allegedly was maintained by the Mayor's office and contained as many as 4,600 names. Individuals on the list were barred from City employment. The existence of the list was made public in 2009, and the names on the list, including O'Gorman's, were published in a February 2011 press release by the City. The list was revised in 2011 to include only individuals who had engaged in illegal acts or

---

[2] The Amended Complaint details the history of the prosecution and conviction of certain City employees of Mayor Daley's administration for patronage appointments. *See* Am. Compl. ¶¶ 41-44 (citing *United States v. Sorich*, 523 F.3d 702, 706 (7th Cir. 2008), and describing the Shakman Decrees). That history is not relevant to deciding this motion to dismiss.

other acts of moral turpitude, yet continued to include O'Gorman. O'Gorman alleges that once a person's name is added to the list, there is no process to seek its removal.

On April 10, 2010, the City reopened a civil case – which had been stayed, pending the outcome of the criminal case – against O'Gorman, under the Illinois Whistleblower Act and the Chicago False Claims Act. In February 2011, Anthony Pilas, O'Gorman's assistant, was fired following an employment hearing, during which the hearing officer made findings of fact that implied criminal activity by O'Gorman based on testimony from the Inspector General's Office.

O'Gorman filed this lawsuit in April 2011. After his original complaint was dismissed, O'Gorman filed an amended complaint. In Count 1, O'Gorman alleges that the City deprived him of his property and liberty interests in employment without due process, violating his rights under the Fourteenth Amendment.[3] In Count 2, O'Gorman alleges that the City failed to afford him equal protection under the law, also in violation of his rights under the Fourteenth Amendment. O'Gorman seeks redress under the Fourteenth Amendment and 42 U.S.C. § 1983. *Id.* at 22, 25.[4] The City again has moved to dismiss all claims.

## II.     Legal Standard for Rule 12(b)(6) Motion to Dismiss

"A motion under Rule 12(b)(6) challenges the sufficiency of the complaint to state a claim upon which relief may be granted." *Hallinan v. Fraternal Order of Police Chicago Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). To survive a Rule 12(b)(6) motion to dismiss, a

---

[3]  O'Gorman contends that he had been temporarily suspended between the time of his resignation on August 24, 2007, and the list's publication in February 2011, or alternatively, that he reasonably believed he had been temporarily suspended and only discovered that he had been permanently terminated upon the list's publication in February 2011.

[4]  Only Count 1 specifically references 42 U.S.C. § 1983, but since that statute also provides a remedy for equal protection violations by the City, a cause of action against the City directly under the U.S. Constitution, via the Fourth Amendment, is precluded. *Ward v. Caulk*, 650 F.2d 1144, 1147 (1981). Therefore, the Court construes the amended complaint to assert both claims (due process and equal protection) under 42 U.S.C. § 1983.

complaint must satisfy the requirements of Rule 8.  Fed. R. Civ. P. 8.  First, the complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), such that the defendant is given "fair notice of what the * * * claim is and the grounds upon which it rests."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 545 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957).  A "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). These allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. And the allegations that are entitled to the assumption of truth are those that are *factual*, rather than mere *legal* conclusions. *Iqbal*, 129 S. Ct. at 1950.  "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic*, 550 U.S. at 555 (citations, quotation marks, and brackets omitted).

## III.    Analysis

Section 1983 provides a cause of action against a person, who, acting under color of state law, deprives an individual of any "rights, privileges, or immunities secured by the Constitution and laws" of the United States. *Livadas v. Bradshaw*, 512 U.S. 107, 132 (1994).  It provides the procedural vehicle for bringing suit as a "method for vindicating federal rights elsewhere conferred." *Graham v. Connor*, 490 U.S. 386, 393-94 (1989).  The plaintiff must identify the specific constitutional right that was infringed.  *Id.* at 394.  O'Gorman alleges that the City deprived him of his property and liberty interests without due process and failed to afford him equal protection under the law, all in violation of the Fourteenth Amendment.  In moving to

dismiss the amended complaint, the City advances several arguments with respect to each of O'Gorman's claims. The Court will address each of his due process claims first and then his newly added equal protection claim.

### A. Property Due Process Claims

In his original complaint, O'Gorman alleged that the City deprived him of his property and liberty interests in employment without due process in violation of his rights under the Fourteenth Amendment. The judge previously assigned to this matter dismissed O'Gorman's property due process claims arising from his loss of employment in 2007, finding that on the face of the complaint those claims were barred by the statute of limitations. To the extent that O'Gorman stated separate claims based on the City's refusal to reinstate him in 2010, the prior judge held that the claim was timely, but ultimately dismissed the complaint because O'Gorman failed to adequately allege municipal liability for the promise to reinstate and the creation of the "Do-Not-Hire List."[5]

O'Gorman's amended complaint continues to assert a number of property due process claims. In response to the City's motion to dismiss, O'Gorman sets forth several theories of liability with respect to his property due process claims. O'Gorman alleges five supposedly distinct property due process claims: (1) his loss of City employment in July 2007 without due process; (2) his loss of all future City employment without due process when O'Gorman was placed on the "Do-Not-Hire List" in July 2007; (3) his "second loss" of future City employment without due process around 2010 or 2011 when the list was revised but continued to include O'Gorman's name; (4) his loss of employment as a teacher with the City Colleges in August

---

[5] The prior judge also noted that O'Gorman failed to adequately allege the deprivation of a property interest because he did not allege that a person with authority promised to reinstate him and speculated that O'Gorman's liberty interest claim based on the list might fail under the statute of limitations because the injury arose from O'Gorman's 2007 resignation.

2008 without due process; and (5) the City's failure to rehire him without due process in early 2010 after he was acquitted of criminal charges. The City argues that O'Gorman's property due process claims should be dismissed because (1) the claims are time-barred, (2) there is no basis for municipal liability, and (3) O'Gorman does not adequately allege that he had a property interest in reinstatement. As explained below, the Court dismisses all of Plaintiff's property due process claims.

### 1.    Statute of limitations

In regard to O'Gorman's claim that he was forced to resign without due process in 2007, the City argues that the claim should be dismissed based on the statute of limitations. The statute of limitations for § 1983 claims is based in state law, and in this case, O'Gorman's due process claims must be brought within two years. *Washington v. Summerville*, 127 F.3d 552, 555 (7th Cir. 1997). Although state law determines the length of the limitations period, federal law determines when a constitutional claim accrues (and thus when the limitations period starts). *Wilson v. Giesen*, 956 F.2d 738, 740 (7th Cir. 1991). Accrual generally occurs when a "plaintiff knows or should know that his or her constitutional rights have been violated." *Id.*

The prior judge granted the City's earlier motion to dismiss based, in part, on the expiration of the applicable statute of limitations. But it did so with the understanding that a court may only dismiss a complaint at the pleadings stage "when the plaintiff effectively pleads [himself] out of court by alleging facts that are sufficient to establish [a statute of limitations] defense." *Hollander v. Brown*, 457 F.3d 688, 691 n.1 (7th Cir. 2006) (citation omitted). That is because under the Federal Rules of Civil Procedure, a complaint need not anticipate or overcome affirmative defenses such as the statute of limitations. *Career Foundation, Inc. v. Cerberus Capital Mgmt., LP*, 559 F.3d 671, 674 (7th Cir. 2009). In fact, "[d]ismissing the complaint as

untimely at the pleading stage is an unusual step." *Id.* Nevertheless, dismissing certain of O'Gorman's due process claims was warranted because his original complaint affirmatively pled that he was forced to resign in 2007 and was told *at that time* that a hearing on the personnel charges would be a sham. Compl. ¶¶ 24, 27.

O'Gorman's amended complaint again risks pleading his 2007 resignation claim out of court because he again alleges that he was told that his hearing would be a sham before he resigned. Am. Compl. ¶ 30. At that point, O'Gorman should have known that his constitutional rights were violated, and he had two years to bring a claim. In response to the City's current motion to dismiss his amended complaint, O'Gorman offers two new arguments why his due process claims arising from his 2007 loss of employment should not be dismissed based on the statute of limitations: (1) application of an Illinois savings statute; and (2) application of the discovery rule. As explained below, neither argument saves a claim based on his 2007 resignation.

O'Gorman argues that under an Illinois savings provision, O'Gorman had until 2013 to file any claims against the City relating to his resignation in 2007. The City filed a lawsuit against O'Gorman in 2007 that included claims brought under the Chicago False Claims Act, Chi. Mun. Code § 1-21-010. A provision of the Illinois Code of Civil Procedure, 735 ILCS 5/13-207, allows a defendant in an action to assert any counterclaims against a plaintiff, even if they are time-barred. Thus, according to O'Gorman, he has up to six years (the limitations period for False Claims Act claims), or until 2013, to file any claims against the City, including any due process claims. Implicit in O'Gorman's argument is that his due process claims should be considered "counterclaims" to the City's state court lawsuit under § 13-207.

While the Court must derive the applicable statute of limitations from Illinois law, the specified Illinois statute does not serve to extend the normal two year statute of limitation in this case. Section 13-207 of the Illinois Code of Civil Procedure states, in relevant part:

> A *defendant* may plead a set-off or *counter*claim barred by the statute of limitation, while held and owned by him or her, to any action, the cause of which was owned by the plaintiff or person under whom he or she claims, before such set-off or counterclaim was so barred, and not otherwise.

735 ILCS 5/13-207 (emphasis added). The Seventh Circuit has explained that this provision "provides that a person named as a defendant in a lawsuit may sometimes pursue a claim that otherwise would be time-barred by asserting it as a counterclaim against the original plaintiff." *Oak Park Trust and Sav. Bank v. Therkildsen*, 209 F.3d 648, 649 (7th Cir. 2000); see also *Bethlehem Steel Corp. v. Chicago E. Corp.*, 863 F.2d 508, 511 (7th Cir. 1987) ("The essence of this somewhat cumbersome provision is that a defendant in a lawsuit may bring a counterclaim after the period authorized by the applicable statute of limitations has elapsed, as long as the plaintiff's claim arose before the cause of action brought as a counterclaim was barred."). The purpose of § 13-207 is to "prevent plaintiffs from intentionally filing their claims as late as possible in order to preclude defendants from a reasonable opportunity to file their counterclaim within the original limitations period." *Bd. of Trs. of Rend Lake Conservancy Dist. v. City of Sesser*, 959 N.E.2d 1287, 1289-90 (Ill. App. Ct. 2011) (citation omitted).

A plain reading of the statute demonstrates that it cannot save O'Gorman's otherwise time-barred claim. In particular, O'Gorman is not a "defendant" in this case and his due process claims in this case are not "counterclaims." The City filed suit against O'Gorman in state court in 2007 asserting claims under the Illinois Whistleblower Act, 740 ILCS 174/1 *et seq.*, and the Chicago False Claims Act, Chi. Mun. Code § 1-21-010. Am. Compl. ¶ 68. O'Gorman has not alleged that he filed any counterclaims in that suit. By all accounts, O'Gorman's present suit is

entirely separate from (albeit factually related to) the City's state court lawsuit. O'Gorman is correct that Illinois courts have recognized the "wide latitude" § 13-207 affords to counter-plaintiffs, and have construed the language liberally to allow the assertion of any counterclaim, even one that is factually unrelated to the original action. *Shaffer v. Respect, Inc.,* 1999 WL 281345, at *6 (N.D. Ill. Mar. 30, 1999) (citing *Cameron Gen. Corp. v. Hafnia Holdings, Inc.*, 683 N.E.2d 1231, 1238 (Ill. App. Ct. 1997). But *Shaffer* does not hold that "counterclaims" should be construed so liberally as to encompass separate *suits* filed by the original defendant as a plaintiff in a different forum. *Shaffer* considered whether defendants sued by their former counsel for legal fees could assert malpractice counterclaims against the original plaintiffs, even though the applicable limitations period had expired. 1999 WL 281345, at *1-3. Although *Shaffer* rejected the original plaintiff's argument that the counterclaims should have been brought in an earlier-filed (and voluntarily dismissed) state court action, the court never held or suggested that the counter-plaintiffs (original defendants) could have used § 13-207 to institute their own original action. *Id.* at *7. Therefore, *Shaffer* does not support O'Gorman's argument in this case that § 13-207 alters the two year statute of limitations on his claims.

O'Gorman's reliance on *Pape v. Byrd*, 582 N.E.2d 164 (Ill. 1991), and *Barragan v. Casco Design Corp.*, 837 N.E.2d 16 (Ill. 2005), also is unavailing. *Pape* is a procedurally complicated case, but was originally comprised of two separate proceedings, one in probate and another in chancery. 582 N.E.2d at 166-67. All of the claims involved a dispute over the guardianship of an estate. The parties (Pape and Byrd) instituted separate but related actions in multiple forums: Pape brought claims against Byrd in chancery court to invalidate Byrd's marriage, while Byrd filed a petition in probate against Pape to remove Pape as guardian of the subject estate. *Id.* Pape asserted counterclaims in the probate proceeding, including a

counterclaim to invalidate Byrd's marriage. *Id.* at *167. An issue on appeal was whether Pape's claim in chancery to invalidate Byrd's marriage, which was also asserted as a counterclaim in probate, was barred by the statute of limitations. *Id.* The Court held that Pape's counterclaim to invalidate the marriage in the probate proceeding fell within the scope of § 13-207 and therefore was not barred by the statute of limitations. *Id.* at 171. While the procedural posture is in many ways similar to this case, there are two important distinctions. First, the probate and chancery proceedings were formally consolidated before a ruling was issued on the statute of limitations issue. *Id.* at 166. Therefore *Pape* does not specifically deal with the question of whether § 13-207 applies where the "counterclaim" is asserted as an entirely new action. Second, the court's ruling was based on applying § 13-207 to Pape's true counterclaim in the probate proceeding, *not* to her affirmative claims in the separate chancery proceeding (those claims were precluded for other reasons). *Id.* at 172. *Pape* does not stand for the proposition that § 13-207 would have allowed Pape to institute an *original* action in chancery against Byrd to invalidate Byrd's marriage.

*Barragan* involved competing claims between two defendants for contribution based on a settlement that one of the defendants reached with the plaintiff in the case. *Barragan* simply held that "a codefendant initiating an adversarial relationship by filing a cross claim against another codefendant is considered a 'plaintiff' and the codefendant filing a counterclaim in response is considered a 'defendant' for purposes of [§ 13-207]." 837 N.E.2d at 22. *Barragan* did not hold that a plaintiff filing an entirely new claim can seek the protection of the savings statute as a "defendant." As explained above, such a holding would be contrary to the plain language of the statute. *Barragan's* seemingly counter-textual holding was not contrary to the language of § 13-207 at all; it was based on the Illinois Code of Civil Procedure, which

specifically "deems a party bringing a counterclaim to be a 'plaintiff.'" *Barragan*, 837 N.E.2d at 21 (citing 735 ILCS 5/2-401(d)). Therefore, § 13-207 cannot defeat the City's statute of limitations defense in this case.

O'Gorman also argues that the discovery rule should apply to his claims based on his 2007 resignation because he did not discover the nature of his injury until 2011. When, as here, the statute of limitations is borrowed from state law, federal common law supplies the relevant rule. *Brademas v. Ind. House Fin. Auth.*, 354 F.3d 681, 686 (7th Cir. 2004). The discovery rule serves to postpone the date an action accrues, which otherwise occurs on the date a plaintiff was wronged. *Id.* The rule postpones the beginning of the limitations period to the date when the plaintiff discovers or should have discovered that he has been injured. *In re Cooper Antitrust Litig.*, 436 F.3d 782, 792 (7th Cir. 2006).

According to O'Gorman, while he "knew that he would not receive a fair trial in 2007, he had no reason to believe that he could not simply reapply for employment after he was acquitted of criminal charges." Am. Compl. at 11. But by O'Gorman's own admission, he was aware when he resigned that the City (allegedly) was depriving him of due process. Bailey, the City's HR Director, told O'Gorman's Union representative that if O'Gorman did not resign, he would be fired and that the hearing (if he chose to participate in one) would be a sham. Am. Compl. ¶ 30. Therefore, O'Gorman knew that he was injured and knew the basis for his claims at the time that he was forced to resign in 2007 and should have brought these claims within two years of his resignation. That he later discovered his injury to be more extensive than he thought in 2007 is no basis to toll the running of the limitations period. See *Devbrow v. Kalu*, 705 F.3d 765, 768 (7th Cir. 2013) ("The statute of limitations starts to run when the plaintiff discovers his injury

and its cause even if the full extent or severity of the injury is not yet know.").[2]  Because O'Gorman's reliance on both the Illinois savings statute and the discovery rule is unavailing, his property due process claim arising from his 2007 forced resignation is barred by the statute of limitations.

### 2. *Valid property interest*

Remaining are O'Gorman's second (loss of future City employment due to being placed on the list in 2007), third (loss of future City employment due to the list being revised but O'Gorman's name remaining), fourth (loss of employment as a teacher with the City Colleges of Chicago) , and fifth (loss of future employment based on the City's failure to reinstate him after he was acquitted of criminal charges) property due process claims.  At least the second and fourth claims would have to overcome the City's statute of limitations defense, since O'Gorman allegedly was placed on the list in 2007 when he resigned and was fired as a teacher with the City Colleges in August 2008.  Am. Compl. ¶¶ 53, 62.  Both injuries occurred more than two years before O'Gorman filed his complaint in April 2011.  But since O'Gorman alleges that he was not informed that he would be placed on the list in 2007 or advised of the reason for his firing in 2008, the discovery rule likely would allow O'Gorman's second and fourth claims to proceed at this stage.  *Id.*  But all of Plaintiff's remaining claims (second through fifth) must be dismissed for another reason—none of them properly asserts a valid property interest.

To establish a due process claim based on the deprivation of a property interest, O'Gorman must allege a constitutionally protected interest. *Moss v. Marton*, 473 F.3d 694, 700

---

[2]   *Booker v. City of Chicago*, 2011 WL 6152290 (N.D. Ill. Dec. 6, 2011), another case relied upon by O'Gorman, is similarly distinguishable.  In *Booker*, the plaintiff alleged that defendant police officers actively concealed civil rights violations and thus he could not discover his injury until he discovered that the officers were trying to frame him.  *Id.* at *4.  Here, O'Gorman does not claim that the City attempted to conceal their alleged failure to afford O'Gorman due process before he was forced to resign in 2007.  In fact, by Plaintiff's allegations, they were quite open about it.

(7th Cir. 2007). Property interests are not created by the Constitution but are instead derived from independent sources, such as state law. *Johnson v. City of Fort Wayne, Ind.*, 91 F.3d 922, 943 (7th Cir. 1996). To establish a property interest in future employment (claims two, three, and five) or in his City Colleges job (claim four) under Illinois law, O'Gorman must allege that he legitimately expected future City employment or that his City employment would continue based on a specific "ordinance, state law, contract, or understanding limiting the ability of the state or state entity to discharge him." *Moss*, 473 F.3d at 700 (quoting *Krecek v. Bd. of Police Com'rs of La Grange Park*, 646 N.E.2d 1314, 1318-19 (Ill. App. Ct. 1995)). O'Gorman fails to adequately allege that he had a property interest in not being including on the "Do-Not-Hire List" or in continuing employment with the City Colleges. The only basis for a property right that O'Gorman asserts in his Amended Complaint is for the 2007 job that he resigned from, based the City of Chicago's Personnel Rules. Thus, O'Gorman's second, third and fourth property due process claims must be dismissed.

That leaves O'Gorman's fifth claim, in which he asserts a property due process claim based on the City's failure to reinstate him after he was acquitted of criminal charges. O'Gorman alleges that before he resigned in 2007, Frank Scalise, the City's Deputy Commissioner, and Ron Huberman, Mayor Daley's then-Chief of Staff, assured O'Gorman that he would be reinstated once he was acquitted of the pending criminal charges. Based on those representations, O'Gorman resigned in August 2007.

The first question is whether the statute of limitations precludes O'Gorman's fifth claim. As explained above, the limitations period for this § 1983 due process claim is two years. However, unlike O'Gorman's claim based on his resignation, the limitations period for a due process claim based on the City's refusal to re-hire or reinstate O'Gorman would not begin until

O'Gorman knew or should have known that he would not be re-hired, despite being acquitted of the criminal charges. *In re Cooper Antitrust Litig.*, 436 F.3d at 792. O'Gorman alleges that he was acquitted of all criminal charges on January 19, 2010, and requested reinstatement immediately after his acquittal. Therefore, pursuant to the discovery rule, the claim based on a failure to reinstate did not accrue until at least January 2010 (or whenever O'Gorman was definitively informed that he would not be re-hired). O'Gorman was well within the two year limitations period when he filed his complaint in April 2011.

Another hurdle that this claim must overcome, and one that proved fatal to the claim in O'Gorman's original complaint, is that O'Gorman must adequately allege a basis for municipal liability for the promise to reinstate and subsequent decision not to re-hire him in 2010. A local government may be sued under § 1983 for an injury inflicted solely by its employees or agents only if it relates to the execution of the City's official policy or custom. *Monell v. Dept. of Soc. Servs. of New York*, 436 U.S. 658, 694 (1978). To establish municipal liability under § 1983, O'Gorman must present sufficient evidence to show that a constitutional violation resulted from a municipal policy, custom, or practice. *Water v. City of Chicago*, 580 F.3d 575, 580 (7th Cir. 2009) (citing *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 694 (1978). A municipal policy, custom, or practice may be established in one of three ways: (1) by showing that an express policy caused the constitutional violation; (2) by showing a widespread practice that is "so permanent and well-settled that it constitutes a custom or practice"; or (3) by alleging that the constitutional injury was caused by a person with "final policymaking authority." *Id.* (citation omitted). The Court previously dismissed O'Gorman's failure to reinstate claim because he relied on the third way of establishing municipal liability, but failed to allege that anyone with final policymaking authority was involved in the promise and later refusal to reinstate him.

In responding to the City's second motion to dismiss, O'Gorman arguably relies on both the second and third ways to establish municipal liability—that the City had a widespread custom that caused his constitutional violation and that his injury was caused by a person with final policymaking authority. O'Gorman does not specifically articulate how a widespread custom led to the due process violations associated with the City's failure to reinstate him nor does he do more than assert the legal conclusion that Huberman or Scalise had final policymaking authority. However, even before assessing whether O'Gorman has sufficiently alleged a municipal custom, the more pertinent question is whether he has adequately alleged a valid property interest in reinstatement. As explained above, to establish a due process claim based on a property interest, O'Gorman must allege a constitutionally protected interest; that is, he must allege that he legitimately expected that his employment would be reinstated by showing a specific "ordinance, state law, contract, or understanding limiting the ability of the state or state entity to discharge him." *Moss*, 473 F.3d at 700 (quoting *Krecek*, 646 N.E.2d at 1318-19).

O'Gorman cites no ordinance or state law, and fails to identify a written contract, to support his property interest in reinstatement. However, he does more with his fifth claim than he does with his second and third, in that he relies on representations made by supervisor Scalise and Huberman assuring him that the City would rehire him upon his acquittal in the criminal case. But as the prior judge held, neither Huberman nor Scalise had the authority to bind the city on an employment matter. Even if Ron Huberman were "an official representative of Mayor Daley," as the amended complaint alleges, he still lacked the authority to bind the City on an employment matter through some sort of implied contract. Under Illinois law, "a contract cannot be implied if the statutory method of executing a municipal contract has not been followed." *McMahon v. City of Chicago*, 789 N.E.2d 347, 352 (Ill. App. Ct. 2003) ("A municipality's power

to contract is limited by statute and the city cannot be bound unless statutory requirements are followed"); see also *Ad-Ex, Inc. v. City of Chicago*, 565 N.E.2d 669, 673 (Ill. App. Ct. 1990) ("A municipality must follow its own valid ordinances" and "a person dealing with a municipal corporation is charged with the knowledge of the limitations of the power of the corporation for any contract attempted to be entered into by any of its officials.") (internal quotations omitted). O'Gorman does not allege that either Huberman or Scalise followed any statutory (or ordinance-based) method to grant him a property interest in reinstatement. Further, Plaintiff has not pointed to any statutory authority, ordinance, or municipal code that states that the mayor's chief of staff may bind the City with oral promises made to its employees.

The municipal code clearly states that Plaintiff was entitled to due process at the time that the City brought employment charges against him in 2007, but he declined that process and instead chose to resign. Following his resignation, he never regained a constitutionally protected interest in prospective City employment that would have entitled him to due process. Without a protected property interest, there can be no property due process claim. Plaintiff has not cited a single case where a plaintiff established a constitutionally protected property interest in prospective employment, and Seventh Circuit precedent suggests otherwise. See *Moore v. Muncie Police & Fire Merit Comm'n*, 312 F.3d 322, 326-27 (7th Cir. 2002) (stating that the court did "not accept [plaintiff's] untenable claim that he has a property interest in *prospective* employment * * *.") (emphasis in original); *Petru v. City of Berwyn*, 872 F.2d 1359, 1363 (7th Cir. 1989) (stating that "[t]o recognize a 'property' interest for an appointment to a classified position in the realm of public employment would drastically extend the scope of the due process clause and we refuse to make that extension."); see also *Burrell v. City of Mattoon*, 378 F.3d 642, 647 (7th Cir. 2004) ("[T]he existence of a property interest in public employment cognizable

under the due process clause depends on whether *state law* has affirmatively created an expectation that a particular employment relationship will continue unless certain defined events occur.") (emphasis added) (internal quotations omitted).

At its core, O'Gorman's overall theory is that the City violated his constitutional rights in its hiring and firing decisions. To now accept his contention that a wink and a nod from or backdoor deal with Huberman—which also could be described as a "political promise"—gives him a property interest would be to condone exactly the kind of patronage that O'Gorman professes to fight against. Instead, the law is that state law creates an individual's property interest. To allow a representation of future employment by Scalise or Huberman to create a property interest would certainly run afoul of the statutory method for executing a municipal contract. An oral representation, by someone lacking authority to bind the City for employment decisions, did not provide O'Gorman with a property interest in future employment. As a City employee, O'Gorman had his opportunity at due process and declined. He may have been able to challenge that process (or lack thereof), but he filed his case too late. But his claims that hang on "prospective" employment simply fail to derive from any legitimate property right.

To summarize, O'Gorman's property due process claim based on his resignation in 2007 is dismissed as time-barred. O'Gorman's property due process claims based on his name being added to the "Do-Not-Hire List" and on promises of future employment also are dismissed, as is O'Gorman's claim based on being fired from his City Colleges job.

## B.    Liberty Due Process Claims

O'Gorman asserts a number of due process claims based on various liberty interests as well. The claims are better detailed in O'Gorman's response to the City's motion to dismiss than in his amended complaint. There, O'Gorman asserts five distinct instances in which his liberty

interests were violated without due process: (1) the City's failure to afford O'Gorman a hearing in 2007, coupled with the City's False Claims Act lawsuit later that year; (2) the City's refusal to rehire him in 2010, coupled with renewing its False Claims Act lawsuit; (3) the City's continuing refusal to rehire him when it published the "Do-Not-Hire List" in 2011 with O'Gorman's name on it; (4) O'Gorman's firing from his City Colleges teaching job in 2008, coupled with the pending False Claims Act lawsuit; and (5) the City holding a hearing for O'Gorman's former assistant without notifying O'Gorman, coupled with the 2011 publication of the "Do Not Hire List."  The City argues that O'Gorman's liberty due process claims all should be dismissed because O'Gorman fails to allege municipal liability and any constitutional injury and because all the claims are traceable to his 2007 resignation and therefore are time-barred.  The Court agrees that all of the claims are time-barred and therefore does not address the City's additional arguments.

O'Gorman's liberty due process claims are brought under the "stigma-plus" line of cases. See, *e.g.*, *Colaizzi v. Walker*, 542 F.2d 969, 973 (7th Cir. 1976).  Under that line of cases, a public employee may sue his public employer for a procedural due process violation based on a protect liberty interest if the employee suffers a stigma to his reputation at same time that he is discharged (or refused rehire). *Coalizzi*, 542 F.2d at 973.  But under this theory, O'Gorman's claims are all time-barred because the "stigma" element arises out of his resignation in 2007 when the City first accused O'Gorman of theft.  According to the amended complaint, the City first went public with these accusations in May 10, 2007, when it "issued a press release, announcing that Mr. O'Gorman had been charged with diverting 'more than $50,000 in goods from a city lumber contractor for his own personal use from early 2003 to 2005, and then filed false paperwork in an attempt to cover up the theft.'" Am. Compl. ¶ 36. The press release was

published a short time later in the Chicago Tribune and the Inspector General also provided a link to the Tribune article on its website. *Id*.

As with O'Gorman's property due process claim based on his forced resignation, his liberty due process claims based on his resignation in 2007 and the institution of the False Claims Act lawsuit later that year are barred by the statute of limitations. O'Gorman should have brought a claim within two years of his resignation. Similarly, the stigma element of all of O'Gorman's additional liberty due process claims arose out of and was related to the City's first public statement in 2007 accusing O'Gorman of theft of City property: The False Claims Act case was based on these accusations as was the City's decision to place O'Gorman on the "Do-Not-Hire List." Am. Compl. ¶¶ 50, 53, 68. In other words, O'Gorman does not assert a liberty interest due process claim where the adverse employment action and an associated stigma (not arising out of the City's theft accusations against O'Gorman) occurred within two years of filing the complaint in this case.

Nor can the claims be saved by the discovery rule or the Illinois savings statute. O'Gorman became aware of his liberty due process claim in 2007 when he was forced to resign and the City publicly accused him of theft. Although O'Gorman alleges that he was not informed that he would be included on the "Do Not Hire List" when he resigned in 2007, his inclusion on the list does not constitute a stigma to O'Gorman's reputation that could support a claim distinct from the 2007 claims that are barred. See *Devbrow*, 705 F.3d at 768 ("The statute of limitations starts to run when the plaintiff discovers his injury and its cause even if the full extent or severity of the injury is not yet know."). Similarly the renewal of the City's False Claims Act case in 2010 cannot be the basis for a distinct claim, as it too is based on the alleged theft in 2007. And, for the reasons explained above in the Court's discussion of O'Gorman's

property due process claims, the Illinois savings statute, 735 ILCS 5/13-207, is inapplicable to O'Gorman's claims in this case. O'Gorman's liberty due process claims are dismissed.

### C.   Equal Protection

In his amended complaint, O'Gorman adds new claims based on his right to equal protection of the laws under the Fourteenth Amendment. O'Gorman alleges that he was selectively prosecuted and treated less favorably than similarly situated job applicants when he sought reinstatement in 2010. *Id.*

To the extent that O'Gorman's claims are based on the City forcing him to resign in 2007 and the City's refusal to reinstate him, the City argues that the claims are precluded "class of one" claims under *Engquist v. Or. Dep't of Agric.,* 553 U.S. 591 (2008). The Court agrees. Because O'Gorman does not allege that the City treated him differently based on his inclusion in a particular group, O'Gorman's claims fall into the "class-of-one" category of equal protection claims. *Engquist*, 553 U.S. at 601; *United States v. Moore*, 543 F.3d 891, 896 (7th Cir. 2008). In *Engquist*, the Supreme Court held that a class-of-one theory of equal protection "has no place in the public employment context." *Engquist*, 553 U.S. at 594; see also *Avila v. Pappas*, 591 F.3d 552, 554 (7th Cir. 2010) ("[*Engquist*] holds that disputes related to a public employee's interactions with superiors and co-workers *never* may be litigated as class-of-one claims under the equal protection clause."). O'Gorman's equal protection claims based on the City forcing him to resign and refusing to re-hire him are therefore barred.

O'Gorman does not refute that *Engquist* bars his claims to the extent they are based on the City's employment decisions, but argues that his equal protection claim is not limited to the public employment context. O'Gorman contends that he also is bringing a "political influence case" and a claim based on selective prosecution. The former claim is barred because a claim

based on the First Amendment (which is the constitutional basis in the political influence cases) appears nowhere in amended complaint. Although the federal rules require only a notice-pleading standard, "a complaint may be so sketchy that [it] does not provide the type of notice of the claim to which the defendant is entitled under the [Federal Rules of Civil Procedure]." *Agnew v. Nat'l Collegiate Athletic Ass'n,* 638 F.3d 328, 334 (7th Cir. 2012) (internal quotation and citation omitted). Here, O'Gorman has given no notice to the City that he is asserting a claim based on the First Amendment, nor has he asserted facts that would support such a claim (for example, O'Gorman does not allege that he engaged in anything that could be construed as protected speech).

O'Gorman's selective prosecution claim fails because O'Gorman does not allege that the City has the authority to select cases for prosecution. Such an allegation, even if it were made, would not be plausible because such decisions are left to the "exclusive discretion" of the State's Attorney. *People v. Dandridge,* 505 N.E.2d 30, 31 (Ill. App. Ct. 1987). Even if O'Gorman added the proper party, the law of this Circuit precludes class-of-one claims based on selective prosecution. *Del Marcelle v. Brown Cnty. Corp.,* 680 F.3d 887, 897 (7th Cir. 2012) (per curiam) ("[J]ust as public employees cannot bring class-of-one cases against their employer, so also prosecutorial and sentencing discretion is not to be fettered by class-of-one suits." (citing *United States v. Moore,* 543 F.3d 891, 899-901 (7th Cir. 2008))).[7] O'Gorman's equal protection claim is dismissed.

---

[7] *Del Marcelle* was a per curiam decision because a majority of the Court could not agree on the proper standard to apply to class-of-one discrimination claims. *Id.* at 889. Three opinions were written proposing three different standards, but all agreed that prosecutorial discretion should not be subject to class-of-one claims. *Id.* at 897, 903, 916.

### D.        Punitive Damages

Lastly, the City correctly argues that O'Gorman cannot seek punitive damages against a municipality. The Supreme Court has held that "a municipality is immune from punitive damages under 42 U.S.C. § 1983." *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981). The claim for punitive damages is dismissed.

## IV.    Conclusion

For these reasons, the Court grants the City's motion to dismiss [35]. The dismissal is with prejudice. Plaintiff has not requested another chance to replead (see *James Cape & Sons Co. v. PCC Constr. Co.*, 453 F.3d 396, 400–01 (7th Cir. 2006) (rejecting the plaintiff's argument that the district court erred in dismissing its complaint with prejudice, rather than without prejudice and with leave to amend, where the plaintiff did not request leave to amend) and in fact has already been given leave to replead once. Furthermore, the prior judge's opinion detailed the obstacles that an amended complaint would face and Plaintiff still could not overcome those hurdles. See *Gen. Elec. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1085 (7th Cir. 1997) ("Even though Rule 15(a) provides that 'leave shall be freely given when justice so requires,' a district court may deny leave to amend for * * * futility. The opportunity to amend a complaint is futile if the complaint, as amended, would fail to state a claim upon which relief could be granted.") (citation and some internal quotation marks omitted).

Dated: July 25, 2013

_____
Robert M. Dow, Jr.
United States District Judge

23